AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

| United States of America | ) |
|---|---|
| v. | ) |
| Michael Andrew Milano | ) Case No. |
| | ) 6:24-mj-1227 |
| | ) |
| | ) |
| Defendant(s) | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __February 29, 2024__ in the county of __Brevard__ in the __Middle__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § 1324(a)(1)(A)(i) | Bringing Aliens into the United States |

This criminal complaint is based on these facts:

See affidavit

☑ Continued on the attached sheet.

_/s/ Jesus Martin_
Complainant's signature

Jesus Martin, Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: 3/4/2024

City and state: Orlando, FL

DANIEL C. IRICK
UNITED STATES MAGISTRATE JUDGE

STATE OF FLORIDA            CASE NO. 6:24-mj- 1227

COUNTY OF ORANGE

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Jesus Martin, after being duly sworn, depose and state:

1. I am a Special Agent with the U.S. Department of Homeland Security (DHS), Homeland Security Investigations (HSI) since November 2009. Prior to this assignment, I was an Immigration Enforcement Agent with Enforcement and Removal Operations, from June 2007; in all, having served with DHS approximately 16 years. Prior to joining HSI, I served in Military Intelligence, as a Signals Intelligence Reconnaissance Operator, with the U.S. Army, 82nd Airborne Division at Fort Bragg, North Carolina. I am a graduate of two Law Enforcement academies and the Criminal Investigator Training Program at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. I hold a Bachelor of Science degree in Operations Management from the University of Florida and a degree in French from the Defense Language Institute, Foreign Language Center.

2. I am currently assigned to HSI Space Coast in Rockledge, Florida. I am trained and empowered to investigate crimes against the United States, as more fully described in Titles 8, 18, 19 and 21 of the United States Code, amongst others. During the HSI Special Agent Training Program at FLETC, I received basic training in conducting investigations into Human Smuggling. Additionally, I completed advanced human smuggling investigations training during the HSI Advanced

Human Smuggling and Human Trafficking Investigations course at FLETC. I am also trained as a U.S. Customs and Border Protection Air and Marine Operations (CBP AMO) vessel crew member. As a crew member, I am trained to in marine interdiction operations, including maritime human smuggling interdictions.

3. The facts set forth in this affidavit are based on my personal knowledge; information obtained in this investigation from others, including other law enforcement officers; my review of documents, pictures and computer records related to this investigation; and information gained through training and experience.

4. This affidavit is being submitted for the limited purpose of establishing probable cause to support a Criminal Complaint. As such, I have not included each and every fact known to me and law enforcement concerning this investigation. Rather, I have set forth only those facts necessary to establish probable cause to believe that Michael Andrew MILANO, a citizen and national of the United States, committed the offense of Illegally Bringing Aliens into the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(i).

## PROBABLE CAUSE

5. On February 29, 2024, at approximately 7:30 PM, officers with the Florida Fish and Wildlife Conservation Commission (FWC) were conducting offshore maritime safety inspections in and around the Intracoastal Waterway/Indian River (ICW) off the coast of Brevard County, Florida. While on patrol, the FWC officers observed a large pleasure vessel, later confirmed to be a 2018 42-foot Yellowfin offshore center console fishing boat, traveling inside the

2

ICW, north of the Sebastian Inlet, in U.S. territorial waters. The FWC officers, operating in a marked FWC vessel, approached the Yellowfin vessel to board it and conduct a routine safety inspection. As the FWC vessel approached, the FWC officers observed a captain at the helm of the Yellowfin vessel, but no other passengers.

6. Upon boarding the vessel, the FWC officers observed approximately 25 passengers lying in the prone position on the deck of the boat and covering their faces, appearing to avoid detection by observers outside the Yellowfin vessel. Among these passengers were twelve males, eight females (two of whom were believed to be pregnant) and five children (who appeared to the officers to be unaccompanied). None of the passengers possessed identification or U.S. documents, and none of the passengers spoke English. The officers believed the passengers were migrants from Haiti.

7. At the helm of the vessel the FWC officers encountered a male, later identified as Michael Andrew MILANO. The FWC officers discovered and confiscated a Glock 23 .40 caliber firearm, with the serial number AAEV822, which was loaded with eight rounds of ammunition and holstered on MILANO's hip. MILANO also possessed a U.S. Passport and was later confirmed to be a U.S. citizen.

8. Seated alone in the cabin of the vessel, the FWC officers encountered a female who did not possess any identifying documents but identified herself to the FWC officers as M.L. and provided her birth date. Subsequent review of Florida's

3

Driver and Vehicle Information Database (DAVID) confirmed M.L.'s information and that she is a U.S. citizen.

9. Throughout the encounter, including while the FWC and other responding officers were securing M.L., MILANO forcefully instructed M.L. to not speak or say anything to the officers. The FWC officers asked MILANO to explain the situation and MILANO stated he did not want to speak to the officers.

10. At about 9:00 PM, the FWC officers reached out to DHS for support. DHS agents from the U.S. Border Patrol (USBP), CBP AMO, and HSI, including your affiant, along with deputies from the Brevard County Sheriff's Office (BCSO) responded and were escorted to the scene by a FWC boat.

11. HSI agents attempted to interview MILANO; however, he invoked his right to counsel immediately after being read his Miranda Rights. After a CBP AMO officer unsuccessfully attempted to interview M.L., HSI agents then attempted to speak with her. After being informed of her Miranda Rights, M.L. refused to speak to the agents. During this brief exchange, MILANO shouted at M.L. not to speak with the agents. Accompanied by other law enforcement officers, I escorted MILANO and M.L. from the Yellowfin vessel to shore.

12. In the parking lot at the boat landing, both MILANO and M.L. were released from custody. MILANO walked away, but M.L. remained near the law enforcement officers. As MILANO walked away, he shouted profanities and verbal abuse at M.L., again instructing her not to speak to law enforcement. Visibly upset, M.L. stated to the law enforcement officers that she and MILANO have been in a

romantic relationship for over eight years, that he has physically abused her in the past, and that she fears for her safety from him.

### Interview of M.L.

13. On March 2, 2024, during a law enforcement operation, I reencountered and detained M.L. in Brevard County, Florida. After she was read her Miranda Rights, she voluntarily agreed to provide an interview.

14. M.L. explained that her trip with MILANO to the Bahamas on February 29, 2024, was the first such trip she had taken with MILANO.

15. Although M.L. stated that MILANO had previously told her that he has smuggled illegal immigrants into the United States in return for compensation, she indicated that she initially believed the purpose of this trip was to bring supplies, such as food, money, and electronics, to a property in the Bahamas.

16. She stated that prior to their departure to the Bahamas, she and MILANO traveled to a residence in Rockledge, Florida, where they took possession of the vessel they were traveling on. The boat had recently returned from Port Canaveral, where it was filled-up with fuel.

17. At the residence in Rockledge, she and MILANO loaded supplies on the boat before departing. She and MILANO traveled directly to the Bahamas from Rockledge, Florida, with no stops.

18. According to M.L, she and MILANO spent approximately two hours at a residence in the Bahamas and then departed to another boat dock where they met an unknown male. The unknown male loaded several people onto the Yellowfin

5

vessel. M.L. believed these people to be unlawful migrants seeking passage to the United States because none of the people spoke English and had the appearance of Caribbean islanders.

19. After departing from the boat dock, she and MILANO traveled to another boat dock where additional migrants were loaded onto the vessel.

20. M.L. stated MILANO instructed her to find a migrant in the group who spoke some English. MILANO wanted the English-speaking migrant to instruct the other migrants to lay in the prone position on the deck of the boat for the duration of the voyage.

21. M.L. stated MILANO instructed her to collect all belongings and cellular phones the migrants possessed. M.L. collected the migrants' belongings but allowed them to keep their phones.

22. M.L. stated that MILANO refused to allow any migrants to enter the vessel's cabin or use the bathroom on the vessel, including a female migrant who was known to be pregnant. M.L. had to convince MILANO to allow the male migrants to relieve themselves off the side of the vessel.

23. MILANO piloted the vessel from the Bahamas directly to Florida with no stops and no encounters with any other vessel. After arriving at the coast of Florida, MILANO piloted the vessel through the Sebastian Inlet and proceeded north towards the residence in Rockledge. M.L. stated their destination was the private residence they originally departed from in Rockledge. She did not believe the vessel was traveling to Port Canaveral, the nearest port of entry.

24. M.L. explained that she feared for her safety throughout the entire trip. She did exactly what MILANO instructed her to do because MILANO continuously threatened her during the trip and threatened to throw her overboard if she disobeyed him. M.L. added that MILANO had beaten her multiple times prior to the trip. Law enforcement records corroborate M.L.'s statements.

25. Review of Brevard County, Florida court records indicates that in 2018, MILANO was charged with aggravated battery and domestic battery by strangulation, and in 2021, MILANO was charged with battery domestic violence. Both cases were eventually dropped. M.L. was listed as the victim in both cases.

### Corroborating Evidence of Human Smuggling

26. On the evening of February 29, 2024, I interviewed four of the passengers observed lying on the deck of the vessel. Based on my law enforcement experience and familiarity with migrants in this region, I recognized the passengers' language to be Creole, the language of Haiti. Using a telephone, I had a Broward Sheriff's Office Detective, who is fluent in Creole, translate my questions and the passengers' answers. Through the translator, the passengers confirmed they were Haitian citizens and did not have authorization to enter the United States and that they had never been in the United States prior. Each of the passengers stated that they had paid someone to bring them from the Bahamas to the United States by boat, that their original boat had become disabled in transit, and that they ended up on the Yellowfin vessel because MILANO had happened to be passing by and rescued them. Each of the passengers gave an identical account, which I believe they

were coached to give if questioned by law enforcement. I know that it is common for victims of human smuggling to be coached to give a cover story in case they are encountered by law enforcement.

27. I also know that the U.S. Coast Guard (USCG), CBP AMO, and FWC monitor maritime radio traffic and distress calls. On the evening of February 29, 2024, neither the USCG, CBP AMO, nor FWC received any emergency communications regarding a vessel in the waters between Port Canaveral and the Bahamas.

28. The manner of the passenger's transport further underscores that MILANO was transporting the passengers as illicit cargo, rather than as rescuees. When FWC first observed the Yellowfin vessel, none of the passengers, including the children and pregnant women, were seated around the deck or on the empty chairs in the cabin. Rather all passengers were concealed, lying prone on the deck of the Yellowfin vessel.

29. Data recovered from the Yellowfin vessel's on-board GPS unit also reveals that after departing from Rockledge, Florida, the Yellowfin vessel sailed directly to the Bahamas. The data shows that the vessel then returned to Florida traveling directly towards the Sebastian Inlet—not Port Canaveral. The data shows no deviations or disruptions in the vessel's return path, as would be expected if the Yellowfin vessel had responded to another vessel in distress.

30. Inspection of MILANO's passport revealed that it had not been stamped in the Bahamas, indicating a failure to enter the Bahamas through an

authorized port of entry. After leaving the Bahamas, the Yellowfin vessel did not proceed directly to Port Canaveral or any other authorized U.S. Port of Entry. Rather, the vessel was discovered in the ICW, approximately 30–40 miles away from a Port of Entry. Further, officers discovered that M.L. was not carrying a passport with her on the Yellowfin vessel, again suggesting that the vessel was not heading to an authorized Port of Entry.

31. CBP AMO and the USCG detained the noncitizens and transported them by boat to an awaiting USCG Cutter. The noncitizens will be processed for repatriation to Haiti.

### Subsequent Search of the Yellowfin Vessel

32. In addition to the Glock 23 firearm which MILANO had on his person, HSI located and seized an AMT 380, 9mm handgun, serial number R05326, with a magazine, and an unknown handgun with no serial number. These handguns were discovered hidden in compartments around the vessel.

33. A BCSO narcotics K-9 swept the vessel and signaled the presence of narcotics on the forward hull area. After searching the forward hull area of the Yellowfin vessel, CBP AMO and HSI agents discovered five clear bags containing suspected narcotics with a total weight of 1,168.75 grams. The suspected narcotics are undergoing laboratory testing.

34. CBP AMO seized the suspect vessel. A search of the Florida Department of Highway and Motor Vehicles revealed that the vessel is registered in

Rockledge, Florida, but not to MILANO or M.L. The vessel has not been reported stolen.

## CONCLUSION

35. WHEREFORE, based on the foregoing facts and evidence, your affiant respectfully submits that probable cause exists to charge Michael Andrew MILANO, a citizen and national of the United States, for the offense of Illegally Bringing Aliens into the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(i).

_____
Jesus Martin, Special Agent
Homeland Security Investigations

Affidavit submitted by email and
attested to me as true and accurate
by telephone or video conference
consistent with Fed. R. Crim.
P. 41(d)(3) this __4__ day of
March, 2024.

_____
DANIEL C. IRICK
UNITED STATES MAGISTRATE JUDGE

10